# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***Illinois Insurance Guaranty Fund v. Virginia Surety Co.*, 2012 IL App (1st) 113758**

| | |
|---|---|
| Appellate Court Caption | ILLINOIS INSURANCE GUARANTY FUND, Plaintiff-Appellant, v. VIRGINIA SURETY COMPANY, INC., and MGM COMPANY, INC., Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-3758 |
| Filed | October 12, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | When a borrowed employee from an employment agency was injured and the agency's workers' compensation insurer became insolvent, the borrowing employer's workers' compensation insurer was not liable for the workers' compensation benefits due to the injured employee, since the borrowing employer's workers' compensation policy was not "other insurance" for purposes of the Insurance Code and did not have to be exhausted before the Insurance Guaranty Fund became liable. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-004160; the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

J. Murray Pinkston III, of Stone & Johnson, Chtrd., of Chicago, for appellant.

Renee M. Mehl and L. Elizabeth Coppoletti, both of Nyhan, Bambrick, Kinzie & Lowry, P.C., of Chicago, for appellee.

Panel

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Palmer and Taylor concurred in the judgment and opinion.

**OPINION**

¶ 1    Janusz Szaradzinski was injured on the job while his employer, T.T.C. Illinois (T.T.C.), was lending him to MGM Company, Inc. (MGM). When the workers' compensation insurer for T.T.C. subsequently became insolvent, the Illinois Insurance Guaranty Fund (the Fund) made timely payments to Szaradzinski and then filed this action for reimbursement from MGM's workers' compensation insurer, Virginia Surety Company, Inc. (Virginia Surety). The Fund prevailed on cross-motions for summary judgment in the circuit court. In this appeal, MGM's insurer contends its policy did not cover borrowed employees and should not have been construed pursuant to section 546 of the Illinois Insurance Code (Code) to be "other insurance" that must be exhausted before the Fund is liable. 215 ILCS 5/546 (West 2000).

¶ 2    T.T.C. was a temporary employment agency or "employee leasing company" based in Kankakee, Illinois, which loaned Szaradzinski and other workers to MGM. MGM was in the business of manufacturing, repairing, and inspecting intermodal trailers at 1800 West 43rd Street, Chicago, Illinois, 60609-3111. It is undisputed that T.T.C. was contractually responsible for paying Szaradzinski's salary and maintaining workers' compensation coverage, however, the contract between T.T.C. and MGM was not made part of the record before us.

¶ 3    Szaradzinski was a 40-year-old, married father of two minor children and resident of Stickney, Illinois, earning about $34,000 a year as a trailer mechanic when he was injured on January 13, 2000. He was at MGM's site, performing MGM's work, when a tire he was inflating exploded and its heavy metal rim flew into his face, causing nose and skull fractures which required emergency medical care, surgery, and his hospitalization for about 10 days. Szaradzinski received medical expenses and total temporary disability benefits of about $400 per week for about a year as provided by the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2000)). He was able to return to light duty as a trailer mechanic with physician restrictions from climbing or lifting more than 35 pounds and took medication as needed to alleviate headaches, dizziness, depression, anxiety, and insomnia. In 2002, an

arbitrator found Szaradzinski sustained a depressed skull fracture, postconcussion syndrome, and post-traumatic depression; his injuries amounted to a 30% loss of the use of his whole person; and he was entitled to an additional 150 weeks of benefits at the rate of about $400 per week. After further proceedings, Szaradzinki's claim was concluded in 2008.

¶ 4    Approximately $91,000 of the benefits Szaradzinski received were from the current plaintiff, the Fund, after T.T.C.'s workers' compensation insurer, Credit General Insurance Company, was involuntarily dissolved by the Illinois Insurance Department. The Fund exists to "step into the shoes" of troubled insurers by assuming the insurer's obligations for "covered" claims, so that injured workers and policyholders are spared financial loss or excessive delay in payment. *Barbee v. Illinois Insurance Guaranty Fund*, 395 Ill. App. 3d 211, 213 (2009) (insurance guaranty fund was created to maintain the status quo of a claimant in the event of an insurer liquidation); *Roth v. Illinois Insurance Guaranty Fund*, 366 Ill. App. 3d 787, 794 (2006) (insurance guaranty fund protects claimants and policyholders when an insurer becomes insolvent); *Illinois Insurance Guaranty Fund v. Farmland Mutual Insurance Co.*, 274 Ill. App. 3d 671, 674 (1995) (insurance guaranty fund provides limited protection to the public and not to insurance companies). The costs of this protection are spread among insurers conducting business in Illinois, as these entities are required to contribute to the insurance guaranty fund in proportion to their premium income, although, practically speaking, the contributions " 'are passed along to the insurance-buying public in the form of higher premiums.' " *Roth*, 366 Ill. App. 3d at 794 (quoting *Norberg v. Centex Homes Corp.*, 247 Ill. App. 3d 267, 274 (1993)). Disbursements of the Fund's assets are to be offset by claims brought against a solvent insurer whenever possible. *Roth*, 366 Ill. App. 3d at 794. In other words, the insurance guaranty fund is to be considered "a source of last resort." *Farmland Mutual Insurance*, 274 Ill. App. 3d at 673.

¶ 5    The Fund filed suit against the borrowing employer/MGM and its insurer/Virginia Surety, seeking reimbursement based on a combination of the Act and the Code. Section 1(a)(4) of the Act indicates the rights and remedies of the workers' compensation system are available to borrowed employees, the borrower is primarily liable for compensable injuries, the lender has a right of action against the borrower to recover any compensation it is required to pay to discharge this liability, and the employers are authorized to reverse this payment priority. *Evans v. Abbott Products, Inc.*, 150 Ill. App. 3d 845, 847-48 (1986) (discussing the terms of section 1(a)(4)); 820 ILCS 305/1(a)(4) (West 2000). More specifically, section 1(a)(4) of the Act states:

"Where an employer operating under and subject to the provisions of this Act loans an employee to another such employer and such loaned employee sustains a compensable accidental injury in the employment of such borrowing employer and where such borrowing employer does not provide or pay the benefits or payments due such injured employee, such loaning employer is liable to provide or pay all benefits or payments due such employee under this Act and as to such employee the liability of such loaning and borrowing employers is joint and several, provided that such loaning employer is in the absence of agreement to the contrary entitled to receive from such borrowing employer full reimbursement for all sums paid or incurred pursuant to this paragraph together with reasonable attorneys' fees and expenses in any hearings before the [Illinois] Industrial

-3-

Commission or in any action to secure such reimbursement. ***

***

An employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers shall be deemed a loaning employer within the meaning and provisions of this Section." 820 ILCS 305/1(a)(4) (West 2000).

The Fund's reimbursement claim also relied on section 546(a) of the Code, which sets out the Fund's obligation when two or more insurance policies are available:

"An insured or claimant shall be required first to exhaust all coverage provided by any other insurance policy, regardless of whether or not such other insurance policy was written by a member company, if the claim under such other policy arises from the same facts, injury, or loss that gave rise to the covered claim against the Fund. The Fund's obligation *** shall be reduced by the amount recovered or recoverable, whichever is greater, under such other insurance policy." 215 ILCS 5/546(a) (West 2000).

The Fund cited these two statutes in its complaint and motion for summary judgment against Virginia Surety. The Fund pursued the borrowing employer/MGM as a nominal defendant only; MGM was never served and it has not participated in these proceedings.

¶ 6        Virginia Surety cross-motioned on grounds that it did not agree to cover and did not collect a premium to cover borrowed employees at the MGM jobsite. Virginia Surety contended the law and facts disclosed by the record indicated its client, MGM, was free to agree with T.T.C. that T.T.C. would maintain workers' compensation coverage for T.T.C. employees, that MGM was not required by law or by contract to duplicate T.T.C.'s coverage, and that MGM's workers' compensation coverage and premium was limited to MGM employees. Virginia Surety contended the most analogous case is a previous instance in which it refuted the Fund's "other insurance" argument: *Virginia Surety Co. v. Adjustable Forms, Inc.*, 382 Ill. App. 3d 663 (2008).

¶ 7        In *Adjustable Forms*, the owner/general contractor of a large construction project known as River East obtained a "wrap-up" policy for public liability and workers' compensation coverage for the entire project and its subcontractors which included its concrete subcontractor Adjustable Forms. *Adjustable Forms*, 382 Ill. App. 3d at 664. Since the subcontractor was included on the owner's policy, it agreed to notify its insurer (Virginia Surety) to exclude the River East project from its 2000 coverage and it reduced its construction bid by the amount it did not have to pay to its own insurer. *Adjustable Forms*, 382 Ill. App. 3d at 665. This arrangement reduced the subcontractor's bid on the multiyear project in Chicago by $526,793. *Adjustable Forms*, 382 Ill. App. 3d at 665.

¶ 8        A subcontractor employee was injured in 2000 while operating a tower crane at the Chicago construction site, the "wrap-up" carrier became insolvent about a year later, and the Fund had to step into the carrier's shoes to pay workers' compensation benefits and defend the subcontractor from litigation. *Adjustable Forms*, 382 Ill. App. 3d at 664-65. The Fund then sought reimbursement from Virginia Surety as the subcontractor's insurer. *Adjustable*

*Forms*, 382 Ill. App. 3d at 665. Virginia Surety, however, was able to show the court that the subcontractor paid an estimated annual premium for workers' compensation coverage and employer's liability insurance in Illinois in the amount of $146,308, that the policy provided for the actual premium to be based on a payroll audit after the coverage period ended, and that the insurer performed the audit and then refunded $144,743 to the subcontractor in early 2001. *Adjustable Forms*, 382 Ill. App. 3d at 665-66. Thus, Virginia Surety did not retain a premium for the River East project and it argued it had no liability for the injury that occurred there in 2000. *Adjustable Forms*, 382 Ill. App. 3d at 671. The Fund emphasized the lack of policy language specifically excluding the River East site from the scope of the subcontractor's coverage. *Adjustable Forms*, 382 Ill. App. 3d at 670. The Fund contended the subcontractor's policy was "other insurance" under section 546(a) of the Code to be exhausted before the Fund provided compensation, because the worker's injury was one that "arises from the same facts, injury or loss that gave rise to the covered claim." (Internal quotation marks omitted.) *Adjustable Forms*, 382 Ill. App. 3d at 670. The Fund argued that the common set of facts between the contractor's wrap up policy and the subcontractor's policy was that the worker was injured in 2000 while working for the subcontractor on the River East project. *Adjustable Forms*, 382 Ill. App. 3d at 670.

¶ 9        The court acknowledged the general principle that "potential claims against the Fund's assets should be reduced by a solvent insurer, rather than the Fund," but found there was no solvent insurer in the case to offset the Fund's payments to the injured worker. *Adjustable Forms*, 382 Ill. App. 3d at 670. The court's conclusion turned on the fact that Virginia Surety had not retained a premium from its client to provide workers' compensation coverage at the River East worksite. Despite the insurer's connection to the subcontractor, the insurer did not provide coverage for the accidental injury and was not liable for the Fund's reimbursement claim.

¶ 10       In the present case, Virginia Surety contended similar facts supported its claim that the Fund, not Virginia Surety, was ultimately liable for Szaradzinski's claim. The insurer relied in part on the deposition testimony of its employee Michael Rowley, who was questioned after reviewing the underwriting file created when MGM bought the Virginia Surety policy at issue. Similar to *Adjustable Forms*, the file indicated T.T.C. intended to procure its own workers' compensation coverage and that MGM needed coverage only for its own employees. Also, Virginia Surety collected an estimated premium up front, and after the policy period ended, MGM's payroll records were audited to determine its actual premium. Virginia Surety's auditors found that MGM employed 60 people, most of whom were clerical or sales personnel, and that MGM leased 350 workers from T.T.C. Virginia Surety disregarded the leased employees in its premium calculations because its coverage was limited to people that MGM "employed" and Virginia Surety subsequently rejected Szaradzinski's claim because he was a leased employee of T.T.C. and not an "employee" of MGM.

¶ 11       Rowley's testimony was substantiated by the contents of the file, including a cover letter written by MGM's insurance broker in 1999 when MGM applied to Virginia Surety. The broker wrote, "The union employees are leased, and the leasing company [T.T.C.] covers the Workers['] Compensation for these workers. We need coverage [only] for the clerical staff,

salespeople, gate inspectors and the supervisor of *** [MGM's] Michigan location." There was also MGM's insurance application listing three classifications of employees and their estimated total payroll: clerical, $744,000; sales, $45,000; automobile, bus, truck or trailer body manufacturing, $241,000. The policy itself stated, "This insurance applies to bodily injury by accident or bodily injury by disease," and "The bodily injury must be sustained by an employee included in the group of employees described in the Schedule." Also, "We will pay an amount equal to the benefits that would be required of you if you and your employees described in the Schedule were subject to the workers compensation law shown in the schedule. We will pay those amounts to the person who would be entitled to them under the law." And, "[i]n return for the payment of the premium and subject to all terms of the policy," Virginia Surety contracted to provide workers' compensation coverage for "all of your workplaces listed in Items 1 and 4 of the Information Page." Item 1 of the information page indicated the insured was MGM, whose mailing address was "1800 W. 43rd St., Chicago, IL 60609" and "Other workplaces not shown above: 1304 Hilton Road, Ferndale, Michigan [48220]." Like *Adjustable Forms*, the policy indicated the premium would be initially estimated and then finalized after the policy period ended by using actual business records. The premium would be based on:

"payroll and all other remuneration paid or payable during the policy period for the services of:

1. all your officers and employees engaged in work cover by this policy; and

2. all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations."

¶ 12    Rowley's deposition testimony was also consistent with an auditors' report at the end of the coverage period, which stated:

"The Insured provided the ADP master control reports for the employees on the MGM Transportation Services Payroll. These are the only employees on the insureds payroll. The majority of the employees are paid through an employee leasing service called TTC. This leasing company covers all employees on their payroll for workers compensation insurance."

¶ 13    In support of its cross-motion for summary judgment, the Fund responded by citing *Evans* for the proposition that a loaned employee is considered an employee of both the loaning and borrowing employer. *Evans*, 150 Ill. App. 3d 845. The Fund argued that since section 4(a)(3) of the Act requires an employer to insure all its "employees," MGM had to insure every employee at its facility on 43rd Street–even borrowed employees–and that Virginia Surety's attempt to evade liability was rendered "wholly void" by this statute. 820 ILCS 305(4)(a)(3) (West 2000). Section 4(a)(3) of the Act states that an employer must:

"Insure his entire liability to pay such compensation in some insurance carrier authorized, licensed, or permitted to do such insurance business in this State. Every policy of an

-6-

insurance carrier, insuring the payment of compensation under this Act shall cover all the employees and the entire compensation liability of the insured: Provided, however, that any employer may insure his or her compensation liability with 2 or more insurance carriers or may insure a part and qualify under subsection 1, 2, or 4 for the remainder of his or her liability to pay such compensation, subject to the following two provisions:

Firstly, the entire compensation liability of the employer to employees working at or from one location shall be insured in one such insurance carrier or shall be self-insured, and

Secondly, the employer shall submit evidence satisfactorily to the Commission that his or her entire liability for the compensation provided for in this Act will be secured. Any provisions in any policy, or in any endorsement attached thereto, attempting to limit or modify in any way, the liability of the insurance carriers issuing the same except as otherwise provided herein shall be *wholly void*." (Emphasis added.) 820 ILCS 305/4(a)(3) (West 2000).

¶ 14    The circuit court ruled in the Fund's favor, entered judgment for $91,474.56 and costs, and denied Virginia Surety's motion to reconsider the ruling.

¶ 15    We address the entry of summary judgment and questions of statutory interpretation *de novo*. *Roth*, 366 Ill. App. 3d at 792. Summary judgment is a drastic but expeditious and efficient means of concluding litigation where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Roth*, 366 Ill. App. 3d at 792. In cases that require statutory interpretation, we are to determine and give effect to the legislature's intent. *Roth*, 366 Ill. App. 3d at 793. The language of the statute is considered the best indicator of the legislature's intent. *Roth*, 366 Ill. App. 3d at 793. The words the legislature used must be given their plain and ordinary meaning, and unless this approach reveals an ambiguity, we will not resort to any other principles of statutory construction, other than to consider the reason and necessity for the statute and the "evils" it was intended to address. *Roth*, 366 Ill. App. 3d at 792. Similarly, to determine the scope of insurance coverage, we are to apply the traditional rules of contract construction to the policy language in order to ascertain and give effect to the intention of the parties at the time of contracting. *Ryan v. State Farm Mutual Automobile Insurance Co.*, 397 Ill. App. 3d 48, 51 (2009). We are to construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Nicor, Inc. v. Associated Electrical & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 416 (2006). The words used must be accorded their plain and ordinary meaning and applied as written unless this application contravenes public policy. *Ryan*, 397 Ill. App. 3d at 51. Basic insurance and contract law indicate insurance companies provide coverage for particular risks in exchange for premiums and do not gratuitously pay noncovered claims. See, *e.g.*, *Ryan*, 397 Ill. App. 3d at 51-52 (policies are contracts and the insurer's risk corresponds with the insured's premium).

¶ 16    We are also mindful that the Act promotes the general welfare of Illinois by providing an efficient system of rights, remedies, and procedures for the protection of employees. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 180-81 (1979). It was first adopted about a century

ago to replace the "common law rights and liabilities between employers and employees subject to the Act for accidental injuries or death of employees arising out of and in the course of the employment." *Kelsay*, 74 Ill. 2d at 180.

> "Pursuant to the statutory scheme implemented by the Act, the employee gave up his common law rights to sue his employer in tort, but recovery for injuries arising out of and in the course of his employment became automatic without regard to any fault on his part. The employer, who gave up the right to plead the numerous common law defenses, was compelled to pay, but his liability became fixed under a strict and comprehensive statutory scheme, and was not subjected to the sympathies of jurors whose compassion for fellow employees often led to high recovery. [Citation.] This trade-off between employer and employee promoted the fundamental purpose of the Act, which was to afford protection to employees by providing them with prompt and equitable compensation for their injuries." *Kelsay*, 74 Ill. 2d at 180-81.

See also *Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d 155, 162-63 (1991) (indicating that a key purpose of the workers' compensation system is that employees as well as employers benefit from a no-fault, guaranteed, fixed schedule of recovery).

¶ 17    In our opinion, the legal principles and facts indicate the circuit court erred in granting summary judgment to the Fund on grounds that the Virginia Surety workers' compensation policy covered not only MGM's own employees but also the T.T.C. employees lent to MGM. As discussed below, none of the cited statutes required Virginia Surety to compensate T.T.C.'s employee, the underlying goals of the legislation are not furthered by the ruling, and precedent indicates the circuit court's decision was in error.

¶ 18    We reiterate that the Fund has relied on a combination of three statutes. The plain terms of section 546(a) of the Code do not create "other insurance" coverage–the legislation only requires the exhaustion of a policy which covers "the same facts, injury, or loss that gave rise to the covered claim against the Fund." 215 ILCS 5/546 (West 2000). Therefore, unless one of the other two statutes required MGM and Virginia Surety to cover "the same facts, injury, or loss," there is no support for the summary judgment ruling now on appeal.

¶ 19    We next consider section 1(a)(4) of the Act, quoted above, which imposed three key provisions regarding workers' compensation liability in this loaned-employee arrangement: (1) both MGM and T.T.C. were made liable for Szaradzinski's workers' compensation, (2) the lender was given a right of action against the borrower to recover any compensation it was required to pay to discharge this liability, and (3) the employers were authorized to reverse this payment priority. See *Evans*, 150 Ill. App. 3d at 847-48 (discussing the terms of section 1(a)(4)); 820 ILCS 305/1(a)(4) (West 2000). When the Wisconsin Supreme Court applied that jurisdiction's own similar law, it found that the purpose of this type of legislation is plain: "Both the employer who loans and employer to whom the employee is loaned and in whose service he was injured are made liable to the employee in order to make it reasonably sure that the employee will get compensation and to relieve him of the risk of selecting the proper employer against whom to proceed. But as between the two employers [only one of them] is made to bear completely the ultimate loss. This is provided for by giving the lender a cause of action." *American Surety Co. of New York v. Northern Trust Co.*,

2 N.W.2d 850, 851-52 (Wis. 1942). In our opinion, the court's remarks have equal applicability to the Illinois law. When the Illinois legislature specified that the borrowing employer is primarily liable but the two employers may agree to reverse this payment priority, the legislature ensured that one of the two employers would financially prepare for employee accidents and that an injured employee would not lose his or her rights to benefits merely because he or she sought compensation from the wrong employer. The Illinois legislature did not require both a lending employer and borrowing employer to procure identical coverage for the same employees. The legislature did not mandate duplicate coverage and premiums in a loaned worker arrangement, because other sections of the Act limit the amount of compensation a worker may receive, bar any common law or statutory right to recovery from the employer except as provided under the Act, and do not allow a worker to receive a second recovery for the same injuries. 820 ILCS 305/5 (West 2000); *Mason v. John Boos & Co.*, 2011 IL App (5th) 100399, ¶ 7 (affirming dismissal of common law claim where injured worker had received workers compensation benefits). Furthermore, regardless of which of the two employers pays the workers compensation benefits, the exclusivity provision of the Act immunizes both the borrowing employer and the lending employer from further claims. *Evans*, 150 Ill. App. 3d at 848. The Employee Leasing Company Act confirms this, stating "The employee leasing company [(T.T.C. here)] shall be entitled along with the client [(MGM here)] to the exclusivity of the remedy under both the workers' compensation and employers' liability provisions of a workers' compensation policy or plan that either party has secured." 215 ILCS 113/45(1) (West 2000). Thus, duplicative coverage and premiums would not provide a double benefit, but they would unnecessarily increase the cost of using a temporary staff, discourage reliance on temporary employment agencies, and give insurers a windfall whenever employees were loaned. We presume that the legislature did not intend absurdity, inconvenience, or injustice. *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001). Accordingly, we do not construe section 1(a)(4) of the Act to have required MGM to duplicate the coverage that T.T.C. was contractually obligated to obtain for employees it was lending to MGM.

¶ 20    We have also considered the terms of section 4(a)(3) of the Act. This portion of the workers' compensation statute requires that an employer's policy "cover all the employees and the entire compensation liability of the insured," or authorizes the employer to split coverage between two insurers or between one insurer and self-insurance, provided "the entire compensation liability of the employer to employees working at or from one location shall be insured in one such insurance carrier or shall be self-insured." 820 ILCS 305/4(a)(3) (West 2000). Section 4(a)(3) also voids an insurance carrier's attempt to otherwise limit or modify its liability. 820 ILCS 305/4(a)(3) (West 2000). What this means is that an employer and its insurer cannot selectively omit an employee or employees from the coverage of a workers' compensation policy. For instance, the company owner in *General Casualty Co. of Illinois v. Carroll Tiling Service, Inc.*, 342 Ill. App. 3d 883, 888 (2003), employed his parents and reduced the amount of his workers' compensation premium by removing himself, his father, and his mother from the policy. When the father suffered a work-related injury, the insurer relied in part on contract language which entitled it to deny liability for the father's workers' compensation benefits. *Carroll Tiling Service*, 342 Ill. App. 3d at 895. The

court ruled, however, that even an inadvertent acquiescence by the insurer to the employer's apparent violation of section 4(a)(3) of the Act was ineffective to withdraw an individual employee from the workers' compensation policy. *Carroll Tiling Service*, 342 Ill. App. 3d at 895. Due to section 4(a)(3) of the Act, the father was still covered by the policy. *Carroll Tiling Service*, 342 Ill. App. 3d at 895. Another example of section 4(a)(3)'s application is *Travelers Insurance v. Precision Cabinets, Inc.*, 2012 IL App (2d) 110258WC, ¶ 13, where a temporary employment agency obtained workers' compensation coverage and policy endorsements which identified the four clients that were using its employees. The temporary agency sent some of its employees to work for a new client that was in the cabinet-making business, but the agency was slow to add an endorsement for this new client, and there was no endorsement in place when one of the loaned workers, a 61-year-old cabinet maker, was injured while moving a piece of plywood. *Precision Cabinets*, 2012 IL App (2d) 110258WC, ¶¶ 9-13. The court ruled that the temporary agency's insurer could not take refuge in its policy language and, pursuant to section 4(a)(3) of the Act, all of the employees of the temporary agency were covered by its policy. *Precision Cabinets*, 2012 IL App (2d) 110258WC, ¶ 28. Neither of these illustrative fact patterns suggests that a borrowing employer must duplicate the coverage that a lending employer, in apparent compliance with section 4(a)(3), has procured for all of its employees. 820 ILCS 305/4(a)(3) (West 2000).

¶ 21    Moreover, the case that the Fund relied on does not lead to that conclusion. The Fund cited *Evans* for the proposition that a loaned employee is considered an "employee" of both the loaning employer and borrowing employer (*Evans*, 150 Ill. App. 3d 845), and then persuaded the circuit court that this meant MGM had to insure all of the "employees" working at its jobsite, even the T.T.C. employees that were on loan to MGM, in order to comply with section 4(a)(3) of the Act. 820 ILCS 305/4(a)(3) (West 2000). In *Evans*, however, the court specified that it was not addressing the issue of liability for workers' compensation benefits, stating: "[U]nlike most cases involving loaned employees, the liability of Abbott [(the borrowing employer)] or Personnel Pool [(the lending employer)] for plaintiff's worker's compensation benefits is not at issue here. Personnel Pool has paid those benefits and it is not a party to this action." *Evans*, 150 Ill. App. 3d at 847. An opinion is not authority for issues it does not address. The issue addressed in *Evans* was whether the injured worker who received the prompt and no-fault payment of workers' compensation benefits from his lending employer could maintain a negligence suit against his borrowing employer by alleging he was injured while working on the borrowing employer's premises but "was not an employee of defendant." (Internal quotation marks omitted.) *Evans*, 150 Ill. App. 3d at 846. The court ruled that *for purposes of the exclusivity provision of section 5(a) of the Act*, the borrowing employer was considered an employer and the injured worker "retain[ed] no right to recover damages against defendant." *Evans*, 150 Ill. App. 3d at 847. This conclusion does not support the Fund's appeal.

¶ 22    Thus, none of the three statutes the Fund relied upon shifted liability from T.T.C.'s defunct insurer to MGM's insurer. The statutory language is clear and unambiguous, and we find there are no terms which could be construed to require that when a lending employer has workers' compensation coverage, a borrowing employer obtain duplicative coverage, pay duplicate premiums, or increase its self-insured retention to cover borrowing employees.

And, given that a double recovery is not permitted, we find that duplicative coverage over the same workers would not further the purpose of the three statutes or the overall purpose of the Act. In our opinion, the Fund's interpretation is contrary to the intent of the legislature in creating these laws.

¶ 23    Finally, Szaradzinski's claim was never within the coverage of the Virginia Surety policy. Even if the employment agency's insurer had remained solvent, Szaradzinski's claim would not have been within the scope of his borrowing employer's policy. The Virginia Surety policy language, as well as the facts of this case substantiated by the underwriting file and deposition testimony, indicates the coverage was limited to MGM's employees, Virginia Surety did not collect or retain an estimated premium for non-MGM employees, and after an audit at the end of the coverage period, MGM's insurance premium was limited to MGM's payroll. Szaradzinski was never on MGM's payroll and was never covered by the Virginia Surety policy. Accordingly, we find that the Virginia Surety policy was not "other insurance" within the meaning of section 546(a) of the Code, because it did not cover "the same facts, injury or loss that gave rise to the covered claim."

¶ 24    The judgment of the circuit court is reversed.

¶ 25    Reversed.