In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――――

No. 21-1942

ILLINOIS INSURANCE GUARANTY FUND,

*Plaintiff-Appellant,*

*v.*

XAVIER BECERRA,
Secretary of Health and Human Services, et al.,

*Defendants-Appellees.*

―――――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-05920 — **Robert W. Gettleman**, *Judge.*

―――――――――――

ARGUED DECEMBER 3, 2021 — DECIDED MAY 6, 2022

―――――――――――

Before ROVNER, HAMILTON, and JACKSON-AKIWUMI, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff-appellant Illinois Insurance Guaranty Fund is the state-created insolvency insurer for member insurance companies in Illinois. When a member insurer becomes insolvent, the Fund steps in to pay covered claims. In the case of an insolvent health insurer, many claims are for patients who are eligible for both Medicare benefits

and private health insurance. Figuring out how to allocate overlapping coverage for patients covered by both Medicare and private health insurance can be challenging in the best of times. When the insurer becomes insolvent, it gets worse.

In this case, the Illinois Fund sued the federal government seeking a determination that it is not subject to reporting requirements under section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, Pub. L. No. 110-173, § 111, 121 Stat. 2492, 2497–500 (2007), codified at 42 U.S.C. § 1395y(b)(7) & (b)(8). Section 111 requires primary plans, including many private medical insurers, to file certain reports about plan participants and claimants to help the government identify when a primary plan is responsible for repaying medical expenses that Medicare covers conditionally. The Medicare Secondary Payer Act cuts Medicare spending by placing financial responsibility for medical costs with available primary plans first. See *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 874–78 (11th Cir. 2003) (recounting history of Medicare Secondary Payer Act); *Zinman v. Shalala*, 67 F.3d 841, 845 (9th Cir. 1995) (describing Medicare Secondary Payer Act as serving the "overarching statutory purpose of reducing Medicare costs"). Recognizing that time may be of the essence in medical treatment, though, Congress also authorized the government to make conditional payments to cover medical expenses for Medicare beneficiaries insured by a primary plan, subject to later reimbursement from a primary plan. See 42 U.S.C. § 1395y(b)(2)(B)(i).

To help the government recoup these conditional payments, section 111 imposes reporting requirements on health insurers so that the government can identify the primary plan responsible for payment. See § 1395y(b)(7) & (b)(8). These

reporting requirements differ between group health plans and other types of primary plans, which are placed in a catch-all category termed "applicable plan." See *id.* The Illinois Fund believes that it is not an "applicable plan" and thus need not make reports under section 111. It filed this suit seeking a declaratory judgment to that effect. The defendants moved to dismiss for lack of subject-matter jurisdiction, arguing in part that the district court lacked jurisdiction unless and until the government makes a final decision through its administrative processes. The district court agreed and granted the motion to dismiss. We agree with the district court that 42 U.S.C. § 405(h) forecloses subject-matter jurisdiction in this case. The Fund can obtain judicial review of its claim in a federal court only by channeling its appeal through the administrative process provided under 42 U.S.C. § 405(g). We recognize that using the administrative process increases costs and delay for the Fund, but precedent requires (and prudent policy for the massive Medicare program is consistent) that we not permit the Fund's desired shortcut to federal court. We also explain below how, under these particular statutes, the usually-waivable defense of failure to exhaust administrative remedies has become a jurisdictional bar here.

I.   *Factual and Legal Background*

The Fund's case centers on the interaction between different provisions of the Medicare Act designed to allow the government to recoup medical expenses it has paid conditionally. We begin by introducing the Fund, the Medicare Secondary Payer Act, and section 111 reporting. Also, because this suit was in part a reaction to a similar suit involving the California insolvency insurer, this section closes with a discussion of the

California suit and the path the Illinois Fund took to court in this case.

A. *The Illinois Fund*

The plaintiff Fund is a nonprofit, unincorporated legal entity created by the Illinois legislature to manage consequences for claimants and policyholders when an Illinois insurance company becomes insolvent. See 215 Ill. Comp. Stat. 5/532(a), 535; *Lucas v. Illinois Insurance Guaranty Fund*, 367 N.E.2d 469, 470 (Ill. App. 1977). The Fund assumes the obligation for covered claims against an insolvent insurance company and helps distribute its assets. See 215 Ill. Comp. Stat. 5/532, 534.3, 537.4; *Roth v. Illinois Insurance Guaranty Fund*, 852 N.E.2d 289, 295–97 (Ill. App. 2006) (discussing limits on covered claims); see also *California Insurance Guarantee Ass'n v. Azar*, 940 F.3d 1061, 1064 (9th Cir. 2019) (summarizing history of state insurance guaranty funds), abrogated on other grounds by *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022).

The Fund pays for its activities by levying assessments on Illinois insurance companies. See 215 Ill. Comp. Stat. 5/537.6. As a matter of state law, the Fund is "considered 'a source of last resort.'" *Illinois Insurance Guaranty Fund v. Virginia Surety Co.*, 979 N.E.2d 503, 506 (Ill. App. 2012), quoting *Illinois Insurance Guaranty Fund v. Farmland Mutual Insurance Co.*, 653 N.E.2d 856, 857 (Ill. App. 1995). The Fund generally steps into the shoes of the insolvent insurer when the Fund assumes the obligations on a policy, but the Fund is authorized to pay only "covered claims" as defined by Illinois law. See 215 Ill. Comp. Stat. 5/534.3, 537.2; *Hasemann v. White*, 686 N.E.2d 571, 573 (Ill. 1997) (noting that Fund's liability on a covered claim is subject to statutory limits, such as a maximum amount); *Barbee v.*

*Illinois Insurance Guaranty Fund*, 915 N.E.2d 871, 873 (Ill. App. 2009).

   B.  *Medicare as a Secondary Payer*

Medicare is the familiar federal health insurance program for the elderly and people with disabilities. See 42 U.S.C. §§ 1395–1395*lll*; *Abraham Lincoln Memorial Hospital v. Sebelius*, 698 F.3d 536, 541 (7th Cir. 2012). The Secretary of Health and Human Services is responsible for Medicare and administers the program through the Centers for Medicare and Medicaid Services, also known as CMS.

Medicare originally provided primary health coverage even when an insurer such as a group health plan or a liability insurer might also have been responsible for paying the cost of a beneficiary's care, with limited exceptions. See Social Security Amendments of 1965, Pub. L. No. 89-97, § 1862(b), 79 Stat. 286, 325 (barring Medicare from paying for items or services under a workers' compensation law or plan); *Zinman*, 67 F.3d at 843. That changed in the 1980s when Congress acted repeatedly to cut costs by making Medicare the secondary payer for health care when other insurance was available to cover patients. *California Insurance Guarantee Ass'n*, 940 F.3d at 1065 & n.1 (summarizing how Medicare Secondary Payer Act changed Medicare); *Baxter Int'l*, 345 F.3d at 874–75.[1]

---

[1] See Omnibus Reconciliation Act of 1980, Pub. L. No. 96-499, § 953, 94 Stat. 2599, 2647 (making Medicare the secondary payer for services covered by automobile or liability insurance policies or plans, or no-fault insurance); Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 2344, 98 Stat. 494, 1095–96 (authorizing United States to bring actions against primary payers who do not reimburse Medicare); Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9319(a), 100 Stat. 1874, 2010–11 (making Medicare the secondary payer for certain persons with disabilities covered

The Medicare Secondary Payer Act bars Medicare from paying for a beneficiary's health care when payment has already been made by a primary plan but also when such a payment could reasonably be expected. 42 U.S.C. § 1395y(b)(2)(A). In many cases, however, the other payer may refuse or delay payment. For example, if a Medicare beneficiary is injured in a traffic accident, disputes about liability may delay payments by an automobile liability insurer. To avoid leaving beneficiaries helpless in such cases, Congress authorized Medicare to make immediate payments for care but required that primary plans later reimburse Medicare when they bear ultimate responsibility for conditional payments. § 1395y(b)(2)(B)(i) & (B)(ii).

Medicare contractors can recoup a conditional payment owed to CMS by sending the primary plan an initial determination explaining the reimbursement due. § 1395ff(a)(1); 42 C.F.R. §§ 405.904(a)(2), 405.924(b)(16). If a primary plan disagrees with an initial determination, it has a right to appeal through the administrative review process. 42 U.S.C. § 1395y(b)(2)(B)(viii). Congress incorporated provisions of the Social Security Act into Medicare so that an individual or primary plan must exhaust administrative remedies before seeking relief in federal court. See § 1395ii (incorporating bar on federal-question jurisdiction from § 405(h) of Social Security Act); § 1395ff(b)(1)(A) (incorporating provisions for administrative and judicial review from § 405(b) and (g) of Social Security Act).

---

by large group health plans); Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6202, 103 Stat. 2106, 2225–35 (introducing "secondary payer" term).

The appeals process for an initial determination by CMS has four steps. 42 C.F.R. § 405.904(a)(2). First, the plan can ask the contractor making initial determinations on behalf of CMS to perform a redetermination. § 405.940. Next, the plan can seek reconsideration from a "qualified independent contractor." § 405.960. Then the plan can request a hearing before an administrative law judge, who conducts a review de novo. §§ 405.1000, 405.1042. Finally, a plan can seek de novo review from the Medicare Appeals Council, which issues the Secretary's final decision on the matter. §§ 405.1100, 405.1130.

Under 42 U.S.C. § 405(b), a district court has jurisdiction to review a decision by the Medicare Appeals Council. See also 42 C.F.R. §§ 405.1130, 405.1136(a). Section 405(h) bars federal-question jurisdiction for such appeals at any point in the review process. The only statutory source of subject-matter jurisdiction for an appeal of a repayment demand is § 405(g)'s grant of jurisdiction to review a final administrative decision. Thus, if a failure to exhaust administrative remedies defeats jurisdiction under § 405(g), subject-matter jurisdiction is lacking, and failure to exhaust administrative remedies, which is usually a waivable affirmative defense, becomes a jurisdictional bar.

C. *Medicare's Section 111 Reporting Requirements*

To seek reimbursement from a private insurer, however, CMS needs to know that the insurer might provide coverage for the Medicare patient. In 2007, Congress amended the statute to require primary plans to file reports with information about claimants entitled to Medicare benefits. See Pub. L. No. 110-173, § 111, 121 Stat. at 2497–500. For purposes of these reporting requirements, section 111 divides primary plans into two groups with different rules: (i) group health plans, 42

U.S.C. § 1395y(b)(7), and (ii) "applicable plan[s]," the catch-all term for other types of primary plans. § 1395y(b)(8).

In 2012, Congress amended section 111 to give CMS discretion to impose a penalty of up to $1,000 per day for violations. The statute requires CMS to issue regulations specifying how these sanctions would be implemented. See Medicare IVIG Access and Strengthening Medicare and Repaying Taxpayers Act of 2012, Pub. L. No. 112-242, § 203, 126 Stat. 2374, 2380. In 2013, CMS published an advance notice of proposed rulemaking, and in 2020, CMS published for comment a proposed rule specifying how the agency would impose penalties for violations of section 111. See Medicare Program; Medicare Secondary Payer and Certain Civil Money Penalties, 85 Fed. Reg. 8793 (Feb. 18, 2020); 78 Fed. Reg. 75304 (Dec. 11, 2013).

In response to comments on the advance notice of proposed rulemaking, CMS noted that it expected the final rule to fit within the existing structure for appeals of civil monetary penalties assessed by the Department of Health and Human Services. 85 Fed. Reg. at 8795–96, citing 42 C.F.R. §§ 402.19, 1005.1–.23. CMS also said that the final rule, which has not yet been issued, will be enforced only prospectively. *Id.* at 8796.

D. *The California CIGA Litigation*

The California counterpart of the Illinois Fund, the California Insurance Guarantee Association, known as CIGA, sued CMS in 2015 to challenge whether it was obliged to reimburse Medicare for payments advanced by the government when the primary insurer had become insolvent. CIGA argued that it was not a "primary plan" with obligations to

reimburse Medicare for payments. *California Insurance Guarantee Ass'n v. Burwell*, 227 F. Supp. 3d 1101, 1106 (C.D. Cal. 2017), rev'd, 940 F.3d 1061 (9th Cir. 2019). When CIGA filed suit, the current four-tier appeals process for reimbursement demands by CMS was not yet in effect. CMS conceded in that case that its formal demand letters for repayment amounted to final agency actions subject to judicial review. *Id.* at 1106 n.2; see also Medicare Program; Right of Appeal for Medicare Secondary Payer Determinations Relating to Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation Laws and Plans, 80 Fed. Reg. 10611 (Feb. 27, 2015).

The California district court found that the insurance plans administered by CIGA were primary plans subject to reimbursement demands from CMS. *California Insurance Guarantee Ass'n*, 940 F.3d at 1066. On appeal, the Ninth Circuit reversed and agreed with CIGA that it was not a primary plan and was not obliged to reimburse CMS for conditional payments. *Id.* at 1071.

In March 2020, CIGA asked the government whether the Ninth Circuit's determination that it was not a primary plan meant that CIGA was also not required to file reports under section 111. The Director of CMS's Office of Financial Management replied that CIGA no longer had section 111 reporting obligations for payments made on behalf of insolvent California members.

E.  *Procedural History*

Shortly after CMS told CIGA it was off the hook for section 111 reporting, the Illinois Fund asked the government whether the logic of the Ninth Circuit's holding in *CIGA*

meant that the Illinois Fund also had no reporting obligations under section 111. The Director of CMS's Office of Financial Management replied via letter in August 2020 that (i) the *California Insurance Guarantee Association* decision did not apply to the Illinois Fund; and (ii) the Office of Financial Management would not provide written confirmation that the Fund is exempt from section 111 reporting obligations.

The Fund then filed this suit in the district court against the Secretary of Health and Human Services, the Department, and CMS. The Fund seeks a declaratory judgment determining (i) that the Fund is not a primary plan or an applicable plan subject to section 111 reporting; (ii) that CMS's August 2020 letter is a final agency action under the Administrative Procedure Act that should be set aside as arbitrary and capricious; and (iii) that the Fund was not required to go through any existing administrative process to obtain relief.

Defendants moved to dismiss for lack of standing and lack of subject-matter jurisdiction. The district court granted the motion, finding no Article III standing, no federal-question jurisdiction, and no subject-matter jurisdiction under 42 U.S.C. § 405(g) because the Fund had failed to exhaust administrative remedies. *Illinois Insurance Guaranty Fund v. Cochran*, No. 20 C 5920, 2021 WL 1600172, at *2–5 (N.D. Ill. Apr. 23, 2021). The Fund has appealed, arguing that (i) the district court erred in finding no standing when section 111 reporting obligations impose ongoing, present compliance costs; and (ii) there is subject-matter jurisdiction because no administrative channel exists to appeal the Fund's status as an applicable plan.

II. *Discussion*

A. *Exhaustion of Administrative Remedies*

We review de novo the issues of law presented by a dismissal of a complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Int'l Union of Operating Engineers, Local 139 v. Daley*, 983 F.3d 287, 294 (7th Cir. 2020); *Fuqua v. U.S. Postal Service*, 956 F.3d 961, 964 (7th Cir. 2020). Subject-matter jurisdiction sometimes depends on disputed factual issues, and we review for clear error a district court's findings on jurisdictional facts. See *City of Chicago ex rel. Rosenberg v. Redflex Traffic Systems, Inc.*, 884 F.3d 798, 802 (7th Cir. 2018). There is no such factual dispute here. We may affirm the dismissal of a complaint for lack of jurisdiction on any ground that is supported by the record, at least so long as the party asserting jurisdiction has had a fair opportunity to be heard on the issue. See *Fuqua*, 956 F.3d at 964; see also, e.g., *American Homeland Title Agency, Inc. v. Robertson*, 930 F.3d 806, 810 (7th Cir. 2019).

Federal courts have long applied the general rule that a plaintiff must exhaust available administrative remedies before seeking judicial review. See *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 & n.9 (1938) (compiling cases). The exhaustion requirement protects the authority of administrative agencies and promotes judicial efficiency. *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Even when no statutory provision requires exhaustion, courts apply the doctrine prudentially. 4 Charles H. Koch, Jr. & Richard Murphy, Administrative Law and Practice § 12:21 (3d ed.). This prudential requirement can be overcome in some cases of futility and other exceptions. *Id.* Congress has codified administrative exhaustion as a requirement for judicial review under many regulatory

regimes, including programs ranging from Social Security, Medicare, and Medicaid to employment discrimination, environmental protection, and immigration.

In programs like Medicare, governed by the judicial review provisions of the Social Security Act, the Act imposes a strong administrative exhaustion requirement in 42 U.S.C. § 405(g) and (h). Section 405(g) authorizes judicial review of an agency's "final decision," and section 405(h) forecloses other routes to federal court: "No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."

Section 405(h)'s jurisdictional bar extends beyond "ordinary administrative law principles of 'ripeness' and 'exhaustion of administrative remedies.'" *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 12 (2000). Courts consistently hold that § 405(h) bars judicial review of Medicare claims made by plaintiffs who fail to exhaust available administrative remedies as required by § 405(g). See, e.g., *Ancillary Affiliated Health Services, Inc. v. Shalala*, 165 F.3d 1069, 1070–71 (7th Cir. 1999); *Homewood Professional Care Center, Ltd. v. Heckler*, 764 F.2d 1242, 1253 (7th Cir. 1985). Section 405(g) is the only statutory source of jurisdiction for most Medicare claims.

The Supreme Court has recognized a narrow exception to the exhaustion requirement so as to allow federal-question jurisdiction for judicial review apart from § 405(g) when there is simply no other method for a plan or individual to obtain relief under the Medicare Act. The Fund has not persuaded us that it can fit this case into that narrow exception, however. Because the Fund's failure to exhaust administrative remedies

means it cannot invoke the grant of subject-matter jurisdiction in § 405(g), we do not consider the Fund's standing to sue.[2]

B.  *Case Law on the Jurisdictional Bar of § 405(h)*

By its terms, § 405(h) bars federal-question jurisdiction under 28 U.S.C. § 1331 for claims arising under the Medicare Act. See *Your Home Visiting Nurse Services, Inc. v. Shalala*, 525 U.S. 449, 456 (1999); *Mathews v. Eldridge*, 424 U.S. 319, 326–27 (1976), citing *Weinberger v. Salfi*, 422 U.S. 749 (1975) (applying limits of § 405(h) to claim under Social Security Act). In the overwhelming majority of cases, subject-matter jurisdiction over a Medicare claim stems only from § 405(g) of the Act, which requires a party (i) to present the claim to the Secretary; and (ii) to exhaust administrative remedies. See *Eldridge*, 424 U.S. at 328, citing *Salfi*, 422 U.S. at 764; *Martin v. Shalala*, 63 F.3d 497, 502 (7th Cir. 1995). The presentment requirement is essential and non-waivable, though the agency can waive a plaintiff's failure to exhaust some or all of the steps in the administrative review process without defeating jurisdiction under § 405(g). *Eldridge*, 424 U.S. at 328.

---

[2] The district court found that the Fund had waived any argument for federal-question jurisdiction under 28 U.S.C. § 1331 despite the limits of § 405(h). The Fund did not present this argument to the district court as clearly as it should have, but its reliance on the *Michigan Academy* case, discussed below, implicitly and necessarily relied on § 1331 jurisdiction. We therefore elect not to rely on waiver but instead explain why the Fund cannot take advantage of the *Michigan Academy* exception to § 405(h). The district court also found that the Fund had waived its arguments under the Declaratory Judgment Act and the Administrative Procedure Act. The Fund has not raised those issues on appeal, and we do not consider them.

This rather abstract distinction between presentment and exhaustion under § 405(g) is counterintuitive and needs some explanation. In *Eldridge*, the Supreme Court distinguished presentment from "the requirement that the administrative remedies prescribed by the Secretary be exhausted" to emphasize the Secretary's power to waive administrative review only for claims presented to him. 424 U.S. at 328. Neither the Secretary nor the court can waive presentment because § 405(g) requires a decision, and without presentment the Secretary cannot make any decision at all. See *id.*

Courts have not been entirely consistent in how they refer to the prerequisites for obtaining jurisdiction under § 405(g) and may refer to it simply as an "exhaustion" requirement unless presentment is specifically at issue. See, e.g., *Illinois Council*, 529 U.S. at 15 (noting that plaintiff failed to present its claim to the agency and therefore could not establish jurisdiction under § 405(g)); *Ancillary Affiliated*, 165 F.3d at 1070 (referring to § 405(g) as an "exhaustion requirement"); *Martin*, 63 F.3d at 503 (accepting district court's conclusion that the "nonwaivable presentment prerequisite" of § 405(g) was met); see also *Salfi*, 422 U.S. at 765–66 (discussing presentment as part of process of exhausting remedies before *Eldridge* drew this distinction).

This distinction between presentment and exhaustion of remedies makes no difference here, however, because CMS has not waived the exhaustion defense. When the government invokes the defense, we enforce the exhaustion requirement. Even styling a claim arising under the Medicare Act as a constitutional challenge does not ordinarily permit a plaintiff to forgo exhausting administrative remedies. E.g., *Ancillary*

*Affiliated*, 165 F.3d at 1070, citing *Homewood Professional Care Center*, 764 F.2d at 1253.

Still, the Fund sees daylight for this case because the Supreme Court has left open a narrow path where a party can show that enforcement of the exhaustion requirement would make judicial review truly impossible. The Court recognized this path in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 680–81 (1986), in which it considered an attack on the validity of a regulation implementing Medicare Part B. Medicare Part A provides insurance for hospital and other inpatient care, 42 U.S.C. §§ 1395c to 1395i-6, while Part B provides supplemental insurance for outpatient medical services through private insurance carriers. §§ 1395j to 1395w-6. When *Michigan Academy* was decided, judicial review was available under § 405(g) for claims related to an *amount* of benefits under Part A but not Part B. Amount claims under Part B entitled a claimant to no more than a "fair hearing" by the insurance carrier, with no access to judicial or administrative review. See *United States v. Erika, Inc.*, 456 U.S. 201, 207–08 (1982).

*Michigan Academy* distinguished the doctors' challenge to the validity of the regulatory *methodology* used to determine amounts payable under Part B from challenges to the *amount* determinations themselves. *Michigan Academy*, 476 U.S. at 675–76. Challenges to amount determinations under Part B were "quite minor matters," and the Court accepted Congress's intent to delegate them to private carriers. *Id.* at 680 (citation omitted). The Court rejected, however, the Secretary's contention that the Act provided "no [judicial] review at all" for the doctors' statutory and constitutional challenges to the *method* of determining benefits under Part B. *Id.* The Court found a lack of "clear and convincing evidence" needed

to overcome the strong presumption against prohibiting judicial review altogether. *Id.* at 680–81 (citation omitted). Congress made this amount/methodology dichotomy irrelevant in 1986 when it amended the Medicare Act to provide administrative and judicial review for claims under both Parts A and B under § 405(g). See Pub. L. No. 99-509, § 9341(a), 100 Stat. 1874, 2037–38.

A few years later in *Illinois Council*, the Supreme Court made clear that the *Michigan Academy* exception remains narrow and will be construed strictly. The Court expressly rejected the suggestion that a party could circumvent the exhaustion requirement "simply because that party shows that postponement would mean added inconvenience or cost in an isolated, particular case." 529 U.S. at 22. The Court applied a practical and realistic standard, but it insisted on a showing that "hardships likely found in many cases [would turn] what appears to be simply a channeling requirement into *complete* preclusion of judicial review." *Id*. at 22–23 (emphasis in original), citing *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 496–97 (1991).

C. *Judicial Review Not Completely Foreclosed by § 405(h)*

The Fund's claims here arise under the Medicare Act within the meaning of § 405(h). See *Ancillary Affiliated*, 165 F.3d at 1070; see also *Salfi*, 422 U.S. at 760–61. To obtain judicial review via the typical path under § 405(g), the Fund would need to have (i) presented its claim to the Secretary; and (ii) exhausted administrative remedies or secured a waiver. *Eldridge*, 424 U.S. at 328. Here, the Fund has not exhausted administrative remedies, and CMS has not agreed to waive exhaustion. As a result, we have no need to consider whether the Fund's letter to CMS satisfied the presentment

requirement. In any event, there is no jurisdiction over this claim under § 405(g). The only way for the Fund's claim to move forward in federal court is if an exception to § 405(h) applies. As was true for the plaintiff in *Illinois Council*, "without *Michigan Academy*, the [Fund] cannot win." 529 U.S. at 15.

The crux of the Fund's argument for avoiding § 405(h)'s jurisdictional bar is that CMS has not yet issued a final rule providing a mechanism for directly challenging section 111 reporting requirements. According to the Fund, this means that applying § 405(h) would completely preclude judicial review. The argument has some appeal, but a closer look shows that the Fund could challenge its obligations to file reports under section 111 by arguing that it is not a "primary plan" during administrative review of a specific demand for reimbursement by Medicare.

As noted above, section 111 divides primary plans into two categories with different reporting requirements. The term "primary plan" means (i) a group health plan or large group health plan, and (ii) a workers' compensation law or plan, an automobile or liability insurance policy or plan, including a self-insured plan, and no-fault insurance. 42 U.S.C. § 1395y(b)(2)(A). Section 111 reporting requirements for group health plans are specified in § 1395y(b)(7), and requirements for applicable plans in § 1395y(b)(8). The parties do not argue that the Fund is a group health plan, so the specifics of how that term is defined are not relevant here.

More immediately, "applicable plan" means liability insurance (including self-insurance), no-fault insurance, and workers' compensation laws or plans. § 1395y(b)(8)(F). Because the term "primary plan" includes group health plans and all types of applicable plans, if an entity does not qualify

as a primary plan, the entity necessarily has no reporting obligations under section 111.

The Fund claims there is currently no way to challenge directly its reporting obligations under section 111 so that application of § 405(h) would totally bar judicial review of its claim. But the Fund can challenge a demand for reimbursement of a conditional payment made by Medicare through the four-step appeals process described above. See generally 42 C.F.R. §§ 405.900–.1140. During such an administrative appeal, the Fund could argue that it is not a primary plan. See, e.g., *North Carolina Insurance Guaranty Ass'n v. Becerra*, No. 20-CV-522-FL, 2021 WL 4302243, at *9–10 (E.D.N.C. Sept. 21, 2021) (requiring North Carolina insolvency insurer to present its claim that it is not a primary plan to CMS before obtaining judicial review), appeal docketed, No. 21-2185 (4th Cir. Oct. 20, 2021).

If the Fund remained dissatisfied with the outcome, it could obtain judicial review of the question under § 405(g) after exhausting administrative remedies or (perhaps) obtaining an agreement from CMS to waive the requirement of further exhaustion. A determination in any of these administrative or judicial proceedings that the Fund is not a primary plan would clarify that the Fund has no reporting obligations under section 111. Nor does it matter that the adjudicator in a particular step of the administrative process may not be able or willing to answer whether the Fund is a primary plan: "The fact that the agency might not provide a hearing for that *particular contention*, or may lack the power to provide one is beside the point because it is the 'action' arising under the

Medicare Act that must be channeled through the agency."
*Illinois Council*, 529 U.S. at 23 (internal citations omitted).[3]

The relevant statutory provisions reveal that a determination that the Fund is not a primary plan would necessarily mean that it has no section 111 reporting obligations. While applying § 405(h) to foreclose federal-question jurisdiction might cause delay and inconvenience, it would not amount to a "*complete* preclusion of judicial review." 529 U.S. at 23. Accordingly, the *Michigan Academy* exception for such complete preclusion is not available to the Fund here.[4]

Our decision does not conflict with the Ninth Circuit's decision in *California Insurance Guarantee Association*, 940 F.3d 1061. The Ninth Circuit determined that the California insolvency insurer was not a primary plan and was not subject to demands for repayment under the Medicare Secondary Payer Act. *Id.* at 1071. Those issues are not presented in this appeal. The Ninth Circuit found, without elaboration, that the district

---

[3] The Fund does not allege that it receives no demands for repayment under the Medicare Secondary Payer Act that could serve as vehicles for appealing its status as a primary plan. In fact, the Fund informed us that it is now pursuing an administrative appeal of such a demand. It can present its theories in that forum. We do not decide here whether the *Michigan Academy* exception to § 405(h)'s jurisdictional bar would be available to an entity that never receives initial determinations capable of being appealed.

[4] After oral argument, we ordered defendants to submit a letter addressing whether a determination that the Fund is not a primary plan "also conclusively determines whether the [Fund] is required to submit reports under Section 111 of the statute." CMS responded that if the Fund "is categorically excluded from being a primary plan, it cannot be an applicable plan as defined by § 1395y(b)(8)(F) and cannot be responsible for reporting [under section 111]." Appellees' Letter at 2. We agree for the reasons explained above.

court had jurisdiction under 28 U.S.C. § 1331. *Id.* at 1066. The relevant regulation providing an appeals process for primary plans to challenge reimbursement determinations was not finalized until after CIGA filed suit, so the initial determinations sent to CIGA were deemed final agency actions subject to judicial review. *California Insurance Guarantee Ass'n*, 227 F. Supp. 3d at 1106 n.2; see also 80 Fed. Reg. 10611.

In contrast, the jurisdictional bar of § 405(h) controls the Illinois Fund's claim because it can use the appeals process for Medicare demands for repayment to challenge its status as a primary plan. Success in such an appeal would show that the Fund has no section 111 reporting obligations. Because the potential exception to the administrative channeling requirements of § 405(g) and (h) discussed in *Michigan Academy* and elaborated upon in *Illinois Council* is not met here, there is no federal-question jurisdiction over this case.

We respect the Fund's desire to avoid the risk of breaking the law and incurring penalties, but the ongoing burden of complying with section 111's requirements does not entitle the Fund to evade the Medicare Act's channeling requirements. The Fund cannot obtain judicial review of its claim unless it first exhausts administrative remedies via § 405(g). We AFFIRM the district court's dismissal for lack of subject-matter jurisdiction.